UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANDY KARL KELLY,

          Petitioner,

    v.

ROB ST. ANDRE,

          Respondent.

No.  2:23-cv-0537 CKD P

ORDER AND

FINDINGS AND RECOMMENDATIONS

Petitioner is a California prisoner proceeding with counsel with a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  The matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Local Rule 302(b).

On April 20, 2018, petitioner was found guilty by a Sacramento County jury of multiple sex offenses.  On June 29, 2018, he was sentenced to an indeterminate term of 110 years to life imprisonment to be served consecutively to a determinate term of 19 years.  ECF No. 7-2 at 66-71.  Petitioner presents two claims.  For the reasons which follow, the court recommends that the petition for a writ of habeas corpus be denied.

I.  Background

The evidence presented at trial is summarized by the California Court of Appeal in the decision affirming petitioner's convictions and length of sentence.  ECF No. 7-11 at 2-9. Petitioner sought review of the California Court of Appeal's opinion in the California Supreme

1

Court.  The petition was summarily denied.  ECF 7-12.  The claims presented here were also raised in the petition for review.  Id.  Parts of claim 1 and all of claim 2 were presented in the Court of Appeal.  ECF No.  7-11.

II.  Standard for Habeas Relief

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362

/////

/////

2

(2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). In this matter, the state Court of Appeal was the last court to issue a reasoned decision. ECF No. 7-11.

III. Analysis

A. Child Sexual Abuse Accommodation Syndrome (CSAAS)

Psychologist Blake Carmichael testified at trial. The California Court of Appeal summarized his testimony as follows:

> Dr. Carmichael worked as a clinical psychologist in the Child Adolescent Abuse Resource Education Diagnostic and Treatment Center at the U.C. Davis Children's Hospital. Carmichael did not know the victim, had never talked to her or met her, and he knew nothing about this case.
>
> Carmichael testified about delayed disclosure of child sexual abuse. He testified that it is uncommon for children to report sexual abuse soon after it occurs. According to Carmichael, research indicated that only 15 to 20 percent of children report abuse "quickly." Asked about the reasons children do not report quickly, Carmichael testified, "[w]e're looking at kids who are sexually abused primarily by folks they know, people they trust, people they have an ongoing and a loving relationship. And so we can't look at abuse as a thing but more so in the context of that relationship." He testified that often

3

the abuser is a person the child perceives as an authority figure, and children are taught to obey authority figures. Thus, a perpetrator may tell the child victim not to tell anyone, and, if the child does tell, the child would be disobeying the authority figure. Additionally, the child may have a good relationship with the perpetrator. "They enjoy going to movies. They might enjoy playing video games. They get special attention. So a lot of things that make a child feel good also comes from the person that is abusing them." This can make it confusing for the child and make it difficult to disclose the abuse because the child does not "want the person that they care about to get in trouble." The child may not want to disclose the abuse because the person to whom the child might report may have his or her own relationship with the abuser or might rely on the abuser to provide for the family. For example, if a child discloses to the mother, the mother could be upset and family discord could result, for which the child would feel responsible. A child may perceive the threat of this outcome and choose against disclosure. Carmichael testified that some researchers had found that the closer a child victim feels to their abuser, the longer the delay in reporting may be. Child victims also sometimes say they did not report abuse because they thought they would be in trouble. Such children feared both disobeying the abuser and making the person whom they told angry or facing the possibility that the person they tell would not believe them.

Carmichael testified that children may have a flat or numb affect when discussing abuse. "People sometimes expect a child to look sad, to say that they are angry, to have a different look about them talking about something so upsetting. And so we can't think of kids as miniadults. [sic] By the mere fact of them trying to distance themselves from those intense emotions and trying to keep those things at bay and then trying to maybe even appear stoic and not having the thoughts running through their brain, as they are telling about it, can cause them to look unaffected."

When asked if children try to forget the details of abuse, Carmichael responded, "[a]bsolutely." He testified that "one of the classic things to do [is] to try to avoid thinking about it."

Carmichael testified that abused children may not necessarily demonstrate signs of being fearful or afraid or sad about having to be in the presence of the abuser. They can still love their abuser and miss the abuser. "[I]t is not just the abuse that defines that relationship. There are other things they can enjoy with that person."

Turning to the process of disclosure, Carmichael testified that it was not common for children "to say everything that first time they talk about it." Typically, disclosure is not a "one-time event. It is more of a process, sometimes called incremental disclosure: Giving a little bit of information; seeing what the response is and then telling more details as they get more comfortable."

After discussing suggestibility with Carmichael, the prosecutor turned to the subject of false allegations of sexual abuse. Carmichael testified that "the statistics are that ... children making false allegations of sexual abuse are rare. Anywhere between zero and 5

4

or 6 percent ... of allegations are found to be false made by children." Higher rates of false allegations were found in circumstances involving custody disputes or child visitation, such as when a married couple is divorcing. However, in those cases, it was not the children, but rather one parent, making the false allegations.

On cross-examination, defense counsel referred to CSAAS, which Carmichael and the prosecutor had not done during Carmichael's direct testimony, asking if the subjects about which Carmichael testified were part of that broader subject. Carmichael acknowledged that delayed disclosure was, indeed, a subject of CSAAS. Carmichael acknowledged that CSAAS dated to Dr. Summit's 1983 article in which Summit discussed observations of hundreds of children who had been sexually abused and his "observations of some of the things the kids did that weren't expected but also the variety of ways kids can deal with being sexually abused." Carmichael testified that CSAAS did not create a diagnostic tool. He testified that there "is no tool, symptom, check list. There is nothing that is in place today that can tell you if a kid was abused." Rather, CSAAS "is an educational tool to help people understand this population of kids who we know were sexually abused."

Defense counsel asked Carmichael about his direct testimony concerning false allegations: "I think the number you used was between zero to six percent. In some instances the numbers you gave were 30 to 35 percent. You find more false allegations; fair to say?" Carmichael testified that there "are some articles that I referred to that do report a higher rate of false allegations, again, within the context of custody and parents making the allegations." After discussing studies that found few or no instances of false allegations made by children themselves, Carmichael testified that "a vast majority of research since that time has shown low rates of false allegations by kids." However, Carmichael acknowledged that, while the incidence may be low, the occurrence of false allegations made by children does exist.

ECF No. 7-11 at 11-13.

The Court of Appeal found that it was not an abuse of discretion to admit most of this evidence. Id. at 13-16. However, the Court of Appeal found trial counsel's failure to object to some of the testimony fell below an objective standard of reasonableness establishing the first prong ineffective assistance of counsel in violation of the Sixth Amendment:

Here, Carmichael testified that "the statistics are that ... children making false allegations of sexual abuse are rare. Anywhere between zero and 5 or 6 percent ... of allegations are found to be false made by children." Higher rates of false allegations were found in circumstances involving custody disputes or child visitation, such as when a married couple is divorcing. However, in those cases, it was not the children, but rather a parent, making the false allegations. Carmichael testified that false allegations of sexual abuse do occur, but it is rare for children to make those allegations.

5

> Based on the analyses in *Julian*, *supra*, 34 Cal.App.5th 878, *Wilson*, *supra*, 33 Cal.App.5th 559, and *Lapenias*, *supra*, 67 Cal.App.5th 169, we conclude that Carmichael's testimony here was inadmissible. We will proceed directly to a discussion of prejudice. (See generally *Strickland*, *supra*, 466 U.S. at p. 697.)

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court held that ineffective assistance of counsel can provide a basis for habeas relief if it is shown that counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. However, a defendant must also affirmatively prove prejudice. Id. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

After reviewing California case law, the Court of Appeal found no prejudice in this case:

> *Julian* is in stark contrast to the instant case. Here, the victim's interviews were not " 'very different from her testimony' " and there were no " 'serious inconsistencies' " among the two. (*Julian*, *supra*, 34 Cal.App.5th at p. 888.) The victim's accounts of abuse included descriptions of actions and circumstances not typically within the experience of a child her age. The victim had recently had abdominal pain and pelvic pain and a yeast infection, which, although there could be natural causes, is consistent with a past vaginal sexual assault.
>
> Critically, here, the allegations were corroborated by DNA evidence. Nickel testified that, on the sperm fraction he discovered in the victim's underwear, he found a mixed profile, with one female contributor and one male contributor. Defendant was a potential contributor to the male profile in the sperm fraction. According to Nickel, it was 16.1 quadrillion times more likely that the victim and defendant were the contributors to the sample than the victim and a random male. As to the nonsperm fraction, Nickel also discovered a mixed profile, one male and one female. According to Nickel, it was 33,800 times more likely that the victim and defendant were the contributors to the sample than the victim and a random male. Also, Nickel testified that, if he did not have to dilute the sample before amplifying it in order to properly perform his analysis, the "profile would be a lot higher." While the defense relied on a theory of DNA transfer in the washing machine, this theory was seriously undermined by (1) Nickel's opinion, based on a stain in the underwear and epithelial cells found in a cutting, that the underwear had not been recently washed, and (2) the fact that the amount of DNA detected was much greater than the volume of DNA that had been detected in the studies involving the transfer of DNA in washing machines, so much so that secondary transfer could be excluded as an explanation of the presence of defendant's DNA.

> Moreover, the jury here was not "bombarded" with evidence concerning the low statistical incidence of false allegations of child sexual abuse, nor was the jury presented with "a mountain of prejudicial statistical data." (*Julian*, *supra*, 34 Cal.App.5th at pp. 888, 889.)  Instead, Carmichael testified about the low statistical incidence of false allegations briefly on direct examination, his testimony on the subject, including the prosecutor's questions, occupying little more than a single page of the reporter's transcript. On cross-examination, defense counsel asked Carmichael about his direct testimony concerning false allegations: "I think the number you used was between zero to six percent. In some instances the numbers you gave were 30 to 35 percent. You find more false allegations; fair to say?" Carmichael testified that there "are some articles that I referred to that do report a higher rate of false allegations, again, within the context of custody and parents making the allegations."  After discussing two studies that found few or no instances of false allegations made by children themselves, Carmichael testified that "a vast majority of research since that time has shown low rates of false allegations by kids."  However, Carmichael acknowledged that, while the incidence may be low, the occurrence of false allegations made by children does exist.  Defense counsel's cross-examination on the subject encompassed roughly two pages in the reporter's transcript.
>
> We acknowledge that the prosecution did discuss Carmichael's testimony in closing argument.  The prosecution argued to the jury: "And how do we know he molested [the victim]?  No one influenced her to make this up.  No one has been benefited by the horrendous year of [the victim] losing her sisters, the defendant, caregivers, vacation planner. She has no motive to make this up. [¶] Dr. Carmichael told you false allegations are like zero to 5 percent, and that small number is in child custody cases. This is not a child custody case."
>
> But, as we have noted, as to Carmichael's testimony, the court instructed the jury: "testimony about these matters is not evidence that the defendant committed any of the crimes charged against him." And we presume the jury understood and followed this instruction. (*Wilson*, *supra*, 44 Cal.4th at p. 803.)  Given the strength of the evidence, particularly the DNA evidence, we conclude that had Carmichael been precluded from testifying about the statistical data concerning false accusations and the prosecution did not make the above argument during closing argument, it is not reasonably probable defendant would have obtained a different result.

ECF No. 17-11 at 22-25

Petitioner fails to point to anything suggesting that the Court of Appeal's findings are contrary to, or involve an unreasonable application of, clearly established federal law as determined by the Supreme Court or that they were based on an unreasonable determination of

////

7

the facts. [1]   Thus any claims concerning the admissibility of the challenged evidence are barred under 28 U.S.C. § 2254(d).

As to the evidence the Court of Appeal found inadmissible, petitioner seems to suggest the Court of Appeal should have asked not whether the evidence was actually prejudicial pursuant to Strickland, but whether the evidence was harmless beyond a reasonable doubt under Chapman v. California, 386 U.S. 18, 24 (1967), an argument implicitly rejected in Strickland.  Strickland, 466 U.S. 668, 694 (1984).

Even if this court were to find that admission of the evidence deemed inadmissible by the Court of Appeal was the basis of the violation of some federal right other than the right to effective assistance of counsel, the court only grants habeas relief if an error under federal law "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 631 (1993).  Whether a California Court assigns a standard which is more likely to be met by a defendant is generally not of any significance in a habeas action.

For these reasons, petitioner is not entitled to habeas corpus relief as to his first claim.

B.  CALCRIM 1193

The trial court instructed jurors as follows as to consideration of the testimony of Dr. Carmichael:

> You've heard testimony from Dr. Blake Carmichael regarding certain characteristics of children who suffer from sexual abuse and child sexual abuse accommodation syndrome.  Dr. Carmichael's testimony about these matters is not evidence that the defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

ECF No. 7-11 at 26.  This instruction is a modified form of CALCRIM 1193.

Petitioner asserts "[a] misleading or ambiguous instruction violates federal due process where the instruction may cause the jury to misinterpret the applicable law" and "[t]he flawed

---

[1]  Indeed, a court in this district recently found there is no clearly established federal law that admission of CSASS evidence violates the Due Process Clause.  Gosztyla v. Palleres, No. 2:22-cv-0900 WBS CSK, 2025 WL 3640683, *12 (E.D. Cal. Dec 15, 2025).

instruction here compromised petitioner's due process right to a reliable jury determination of his guilt beyond a reasonable doubt by lessening the prosecution's burden of proof." ECF No. 1 at 31.  More specifically,

> [The instruction] is flawed because the last sentence essentially told the jurors they could base their verdict on the assumptions inherent in CSAAS testimony.  In other words, jurors could infer the molestation occurred if [the victim's] conduct was not inconsistent with the conduct of someone exhibiting symptoms of CSAAS.

Id.

The Court of Appeal addressed petitioner's argument as follows:

> "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.)
>
> Arguments similar to defendant's have been rejected by other courts. (*Munch*, *supra*, 52 Cal.App.5th at p. 474, citing *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504; see also *Lapenias*, *supra*, 67 Cal.App.5th at p. 175 [noting that courts have held CALCRIM No. 1193 "accurately informs the jury on the limited use of CSAAS evidence, but the instruction does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof"].) " 'A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused.  The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.  Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested." (*Munch*, at p. 474, quoting *Gonzales*, at p. 504.)  We join the *Lapenias*, *Munch*, and *Gonzales* courts in holding the portion of the instruction about which defendant complains on appeal accurately instructs the jury on the proper use, and proper limitations on the use, of CSAAS evidence.

ECF No. 7-11 at 28.

As explained above, the Court of Appeal's finding that the instruction was a correct statement of California law is not a concern of this court.  See 28 U.S.C. § 2254(a).

The court does not find, as petitioner argues, that the instruction permitted jurors to infer the victim was molested if her conduct was consistent with someone exhibiting the symptoms of

CSASS.  While the CSASS evidence rendered the victim more credible than without it, nothing in the challenged instruction suggests symptoms of CSASS provides a basis for a finding of guilt. On the contrary, the jurors are specifically informed "Dr. Carmichael's testimony about these matters is not evidence that the defendant committed any of the crimes charged against him."

For these reasons, petitioner's second claim should be denied.  Also, the court finds that the Court of Appeal's decision as to petitioner's second claim is not contrary to, or involve an unreasonable application of clearly established federal law as determined by the Supreme Court or based on an unreasonable determination of the facts.   Therefore, relief is precluded under 28 U.S.C. § 2254(d).

Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court assign a district court judge to this case.

IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus (ECF No. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3). Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may

/////

/////

/////

10

waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: January 30, 2026

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
kell0537.157

11